# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 17-12V
### Filed: March 20, 2019
PUBLISHED

| | |
|---|---|
| GREGORY HOOPER,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages;<br>Decision on the Written Record;<br>Influenza (Flu); Shoulder Injury<br>Related to Vaccine Administration<br>(SIRVA) |

*Shealene Priscilla Mancuso, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Glenn Alexander MacLeod, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING AWARDING DAMAGES – SPECIAL PROCESSING UNIT[1]

**Dorsey**, Chief Special Master:

On January 4, 2017, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that he suffered a left shoulder injury caused by an influenza ("flu") vaccination. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters and the undersigned issued a Ruling on Entitlement finding petitioner entitled to compensation for a Shoulder Injury Related to Vaccine Administration ("SIRVA"). For the reasons discussed below, the undersigned finds that petitioner should receive $37,921.48 for lost wages. Petitioner

---

[1] The undersigned intends to post this ruling on the United States Court of Federal Claims' website. **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this published ruling contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

should also receive an award for actual pain and suffering in the amount of $185,000.00 and an award for future pain and suffering in the amount of $1,500.00 per year, for petitioner's remaining life expectancy of 30 years.[3]

## I.    Procedural History

On January 4, 2017, along with the petition, petitioner filed medical records and an affidavit marked as exhibits 1-9.  ECF No. 1.  Petitioner filed a statement of completion on January 18, 2017.  ECF No. 7.  Subsequently, during the initial status conference held February 8, 2017, petitioner indicated that there was a claim for lost wages and an associated workers' compensation claim.  ECF No. 8.  On March 2, 2017, petitioner filed an affidavit, and on March 10, 2017, a status report.  ECF Nos. 9, 10.  The status report stated that a workers' compensation carrier was covering petitioner's medical expenses and paid wage loss benefits, but that petitioner would assert a small wage loss claim to recoup the balance between the benefits paid and his actual wage loss.  ECF No. 10.

On May 15, 2017, respondent filed a status report stating that additional records were requested.  ECF No. 11.  Petitioner filed the requested records between May 31, 2017 and June 5, 2017, along with an amended statement of completion on June 5, 2017.  ECF Nos. 21-23.

On December 7, 2017, respondent filed his Rule 4(c) report in which he conceded that petitioner was entitled to compensation in this case.  ECF No. 36.  On December 8, 2017, the undersigned issued a ruling on entitlement finding petitioner entitled to compensation for his SIRVA.  ECF No. 37.  The parties then began the process of negotiating the appropriate amount of damages.

On March 29, 2018, petitioner filed a status report indicating that the parties had reached an impasse during settlement discussions.  ECF No. 44.  On April 10, 2018, the parties discussed the impasse during a status conference.  ECF No. 45.  Petitioner stated that the damages were comprised of pain and suffering and lost wages.  Both parties stated that they were amenable to briefing the issue of damages.  *Id.*  On April 30, 2018, petitioner filed a joint status report stating that there was no dispute on the issue of lost wages, and that the parties were willing to submit pain and suffering briefs. ECF No. 46.

On April 25, 2018, following a status conference on May 22, 2018, a scheduling order was issued.  ECF No. 51.  The scheduling order noted that the only issue in dispute was damages relating to past and future pain and suffering.  *Id.*  At that time, petitioner's counsel stated she would attempt to obtain updated medical records, and submit a supplemental affidavit regarding petitioner's condition before receiving the

---

[3] Based on petitioner's birth date of August 22, 1975, petitioner is expected to live for approximately 30 additional years.  *See Nat'l Ctr. for Health Statistics*, *United States Life Tables, 2015* (2018) at Table A.

vaccination, during his treatment, and his current condition.  Petitioner filed updated records and affidavit evidence on June 15, 2018.  ECF No. 52.

On August 31, 2018, the parties filed simultaneous briefs discussing the damages issues.  ECF Nos. 54, 55.  This case is now ripe for a determination regarding petitioner's pain and suffering award.

## II.    Relevant Medical History

Petitioner was born on August 22, 1975, and was 40 years old when he received a flu vaccination on October 20, 2015 in his left arm.  Ex. 1 at 1.  The available medical evidence does not reflect a history of left shoulder impairment.

On October 22, 2015, petitioner presented to the emergency department at Claxton-Hepburn Medical Center complaining of left arm and shoulder pain for the previous two days "after getting a flu shot."  Ex. 2 at 11.  At that time, petitioner ranked the pain as 9 out of 10.  *Id.*  However, later in that same visit the pain was reported as a 5 out of 10.  *Id.*  Petitioner's range of motion was limited in his left shoulder.  *Id.*  Petitioner reported that "it really hurt when she put it in", presumably referring to pain at the time of vaccination.

Petitioner was seen for a follow-up for shoulder pain on November 4, 2015.  At that time, petitioner rated his pain as 10 out of 10.  Ex. 2 at 155.  An examination indicated that petitioner did not have a decreased range of motion, but did exhibit weakness and pain in his left shoulder.  *Id*. at 157-58.  Petitioner was prescribed Percocet and a Medrol Dosepak.  Ex. 2 at 154.

Petitioner was seen by Dr. Terry Knowles on November 12, 2015, for left shoulder pain.  Petitioner described his injury as beginning immediately upon receipt of his flu vaccination, and that "2 days later could not move arm, much pain with movement, lower hand and elbow not affected but some paresthesia from shoulder down to elbow…."  Ex. 3 at 34.  Petitioner again ranked his pain as 10 out of 10.  *Id.* at 35.  Dr. Knowles diagnosed petitioner with left shoulder pain, and stated there "could be nerve damage or bursitis or tendinopathy".  Ex. 3 at 34-35.  Petitioner was referred to a neurologist and prescribed Gabapentin.  *Id.*

The next day, petitioner presented to the emergency department with extreme shoulder pain and limited range of motion.  Ex. 2 at 163-171.  Three x-rays were taken, which appeared normal.  Ex. 2 at 14.  Petitioner was diagnosed with left shoulder pain and limited range of motion.  Petitioner was prescribed Percocet and prednisone for the pain.  Ex. 2 at 166.

Petitioner was next seen for left shoulder pain on November 20, 2015.  Ex. 4 at 12.  At that time, petitioner rated his pain as 10 out of 10.  An evaluation of petitioner's shoulder was limited because of "guarding, due to pain and not able to perform evaluation."  Petitioner was referred for an MRI and a steroid injection was

administered.  *Id.* at 13.  Formal physical therapy for pain relief and range of motion was also recommended.  *Id.*

Petitioner began physical therapy on November 20, 2015.  Ex. 5 at 10.  At that time, petitioner described his pain as 0, but at worst a 10.  *Id.* at 10.  Upon inspection, petitioner's pain was recorded as 9/10 with movement of the left shoulder.  *Id.* at 11.  Petitioner also exhibited reduced range of motion and strength.  *Id.* at 11-14.

Between December 4, 2015 and December 29, 2015, petitioner attended ten physical therapy sessions.  Petitioner's pain gradually improved, and he stated that he was pleased with his progress regarding pain, mobility, and strength.  Ex. 5 at 23-29.[4]

On December 30, 2015, petitioner presented to Dr. Knowles for a follow-up examination for left shoulder pain.  Dr. Knowles reviewed his MRI,[5] and indicated that it showed inflammation "suggesting that needle hit bone and cause[d] inflammatory reaction that could be considered frozen shoulder."  Ex. 3 at 28.  Dr. Knowles diagnosed petitioner with left shoulder pain and frozen shoulder.  *Id.* at 28-29.  Petitioner was treated with oxycodone.  *Id.* at 29.  The clinical notes also stated that petitioner had 50% disability, could not shovel, drive, or type with his left hand.  *Id.*

Petitioner attended five additional physical therapy sessions between January 6 and January 14, 2016.  Ex. 5 at 67-87.  On January 14, 2016, petitioner stated he "has made progress with increasing range of motion in all direction and strength continues to slowly improve" but that his "discomfort level continues to vary from day to day."  *Id.* at 87.

Petitioner next attended physical therapy on February 10, 2016, attributing the break in treatment to having to wait for authorization.  Ex. 5 at 89.  Petitioner also stated that "he did not keep up with his exercises while he was waiting for auth and his shoulder is back to the way it was at the beginning."  *Id.*  Petitioner reported pain of a 9, and at worst a 10.  *Id.*

On February 25, 2016, petitioner was seen by Dr. Knowles for another follow-up for his shoulder pain.  Ex. 3 at 26-27.  Petitioner reported no improvement in his shoulder, and that it was "perhaps worse" with limited range of motion and "lots of pain."  *Id.* at 26.  Dr. Knowles noted that the injury was "greatly interfering with [petitioner's] productivity and quality of life."  *Id.*  Petitioner was diagnosed with adhesive capsulitis, and Dr. Knowles noted "worst case of frozen shoulder caused by flu injection 4 mo ago given too high on arm, nearly useless shoulder."  *Id.* at 27.

---

[4] Petitioner also stated that his left shoulder was still painful, and his range of motion was not increased since beginning physical therapy.  Ex. 5 at 58.

[5] Petitioner underwent an MRI on December 3, 2015, that was suggestive of a sprain but not a distinct, definitive tear.  Ex. 2 at 185.

Petitioner presented to Richard Finch, PA, with complaints of ongoing left shoulder pain on March 17, 2016.  Ex. 3 at 22-24.  Upon examination, petitioner exhibited limited range of motion, reduced strength, and "[a]ll movements with pain."  *Id.* at 24.  Additional physical therapy was recommended, and a subacromial steroid injection was performed.  *Id.* at 24-25.

On April 26, 2016, petitioner reported to PA Finch that "[o]ver the past couple weeks the pain has returned as well as a stiffness and decreased range of motion of the left shoulder."  Ex. 3 at 20.  Petitioner was directed to continue physical therapy and home exercises, and another MRI was ordered.  *Id.* at 21.

Petitioner again saw Dr. Knowles on April 28, 2016.  Ex. 3 at 18-19.  Petitioner reported that he was doing physical therapy and massage, and was being referred to a surgeon.  *Id.* at 18.  Petitioner also stated his range of motion was inconsistent, and he was taking oxycodone at night.  *Id.* at 18.

On May 19, 2016, petitioner was seen for a follow-up for his left shoulder pain, and to discuss his MRI results.  The MRI showed a fairly large partial thickness supraspinatus rotator cuff tear, rotator cuff tendinopathy, and downward sloping bone spur at the acromioclavicular joint.  Ex. 3 at 15.  Petitioner was assessed with an incomplete tear of his left rotator cuff, and impingement syndrome.

On June 3, 2016, petitioner underwent arthroscopic left shoulder surgery, manipulation and anterior acromioplasty, and a bursectomy performed by Dr. John Savage.  Ex. 3 at 6-9.

From June 29, 2016 through October 12, 2016, petitioner attended 50 physical therapy sessions.  Ex. 6 at 105, Ex. 7 at 1-3, 101-102.  At his last physical therapy session, petitioner stated he planned to continue on his own and did not want any additional therapy at that time.  Ex. 7 at 101.  The records also indicate that petitioner was able to swim and perform more activities as his range of motion continued to improve.  *Id.*  Petitioner reported that his pain scale was 4 at worst, 0 at best, and at that time a 1.  *Id.*  Regarding petitioner's goals, they were nearly all met, but also indicated he still suffered from residual pain and reduced range of motion.  Petitioner's long-term goals included performing household activities with pain (90% met), sleeping 4 out of 7 nights without waking due to pain (goal met) and lifting a 10 lb. object onto an overhead shelf with pain (75% met).  *Id.*

On August 30, 2016, petitioner saw Dr. Knowles for a workers' compensation recheck.  Petitioner reported his range of motion was improved, and decreased pain in his left shoulder.  At that time, petitioner was no longer exhibiting a disability at work, but did have disability at home with daily tasks.  Ex. 13 at 24. Dr. Knowles reduced petitioner's disability to "0%" and diagnosed petitioner with adhesive capsulitis of his left shoulder.  Ex. 13 at 25.

5

Petitioner saw Dr. Knowles again on January 12, 2017 for a workers' compensation follow-up. Ex. 13 at 18.[6] Petitioner reported that he was finished with physical therapy, that he continued to do routine exercises, and his "sleep is better." *Id.* At another follow-up with Dr. Knowles on April 4, 2017, petitioner reported very little change since his last visit, limited range of motion, pain in his left shoulder, that he was still doing exercises, and was "fairly functional but limited." *Id.* Petitioner also stated that he "love[s] to golf and this prevents him from a full swing." *Id.* At the next follow-up appointment on August 8, 2017, petitioner reported he was "getting slowly better". Ex. 22 at 9. However, Dr. Knowles noted that petitioner had "actually not made much progress recently with abduction to about 90 Deg, and flexion to about 110. [H]igher than this he has pain, no pain when arm is held at low angles." *Id.*

The last medical record was from March 16, 2018, when petitioner saw Dr. Knowles for a follow-up evaluation of his left shoulder. Ex. 22 at 5. Dr. Knowles noted that petitioner had a "systemic inflammatory response to vaccine administration and subsequent injuries in L[eft] shoulder." *Id.* Following surgery, petitioner was "now very stable and has lost about 50% of his L[eft] arm function" but "no pain and good function when using arm below shoulder level." *Id.* Further, Dr. Knowles stated that petitioner "has come to live with it and has reached a plateau" but that he also "functions very well, working with no problem." At that time, Dr. Knowles noted it was unlikely that he would improve further. *Id.*

### III.    Affidavits Filed by Petitioner

On March 2, 2017, petitioner filed an affidavit pursuant to § 11(c)(1). Ex. 10. In his affidavit, petitioner asserted that he suffered a left shoulder injury caused by the flu vaccination he received on October 20, 2015. *Id.* at ¶3. Petitioner averred that he suffered the residual effects of his injury for more than six months and had not received an award or settlement for the injury. *Id.* at ¶¶4-5.

On June 15, 2018, petitioner filed additional affidavits from himself as well as Allexa Hooper (petitioner's daughter), Jeffrey Hooper (petitioner's brother), Elizabeth Hooper (petitioner's wife), and signed witness letters from two of petitioner's children, Delia Hooper and Kelson Hooper. Exs. 16-21.

Petitioner's second detailed affidavit dated approximately 30 months following his shoulder injury provided a more detailed description of his medical history and the impact of his shoulder injury on his activities of daily living. Ex. 16. Petitioner described how his injury effected his ability to complete daily tasks such as driving, yard work, and even showering. *Id.* at ¶ 5. Petitioner also described how the injury limited his ability to engage in recreational activities, and negatively impacted his relationship with his

---

[6] Petitioner also saw Dr. Knowles for a workers' compensation recheck on November 14, 2016, who noted that petitioner had not made any progress since last visit. Ex. 13 at 23.

family.   In addition, while surgery did help alleviate pain, petitioner stated he continues to suffer from a limited range of motion and chronic pain.  *Id.* at ¶ 7-10.

In her affidavit, Ms. Hooper described how petitioner's injury effected his daily activities.  Ex. 17.  Ms. Hooper claimed that, prior to his shoulder injury, petitioner would play the guitar around the house and participate in band practice, an activity that allowed her to feel close and connected to him.  *Id.* at ¶6.  However, "[w]ithout being able to comfortably move his arm, [petitioner] stopped playing guitar around the house, he could no longer lift the heavy equipment of [the] sound system."  Ms. Hooper also described how her other siblings were negatively effected by petitioner's inability to participate in activities such as swimming and golfing.  *Id.* at ¶ 7.

Petitioner's brother, Jeffrey Hooper, also submitted an affidavit.  Ex. 18.  Mr. Hooper stated that, prior to petitioner's vaccination, petitioner would enjoy activities such as bowling, fishing, and golf competitions.  *Id.* at ¶4.  However, after his surgery, Mr. Hooper stated petitioner had difficulty playing golf at all, and when he did compete he was forced to do so in a lower division.  *Id.*  Mr. Hooper also stated that petitioner's current golf swing "is about 50% of what it used to be", and petitioner often complains of pain.  *Id.* at ¶6.  Further, petitioner could no longer enjoy fishing or bowling.  *Id.*

Petitioner's wife, Mrs. Elizabeth Hooper, described how petitioner's injury effected his health and ability to care for his children.  Mrs. Hooper emphasized that petitioner's injury and subsequent treatment limited his ability to carry out routine household duties such as home maintenance, and even simple tasks like unloading groceries.  Ex. 19 at ¶6.  This resulted in a significant stress on the entire Hooper family, as it was not an "easy task for me to hold it all together while my husband had days when he was just falling apart, our children felt helpless as they watched the man they looked up to struggle daily."  *Id.* at ¶10.  Mrs. Hooper also described how his injury resulted in his loss of activities he loved, including golf, bowling, and activities with their children.  *Id.* at ¶8.

The affidavits from petitioner's children, Delia Hooper and Kelson Hooper, reiterate that petitioner's injury caused physical and emotional distress and led to significant disruptions of his ability to care for his family, connect with his children, and perform recreational activities.  Exs. 20, 21.

### IV.   Party Contentions

Petitioner requests reimbursement of $287,921.48 in compensation, consisting of $200,000.00 for actual pain and suffering, $50,000.00 for future pain and suffering, and $37,921.48 for past lost wages.  Petitioner's Brief ("Pet. Brief") at 1.  Respondent does not object to the $37,921.48 in lost wages.  Respondent's Brief ("Res. Brief") at 6.  Thus, the only disputed issue before the undersigned is the amount of damages to be awarded for pain and suffering.

Petitioner argues that he should be awarded $200,000.00 for actual pain and suffering, and $50,000.00 for future pain and suffering for the year following this decision.  Pet. Brief at 1, 9.  Petitioner asserts that "[p]etitioners in the Vaccine Program with less severe SIRVA injuries are routinely awarded less damages than what Mr. Hooper is seeking for his personal pain and suffering."  *Id*. at 6.  Petitioner compares the instant case to two prior cases in which damages were decided by the undersigned.  Specifically, petitioner cites: *Collado v. HHS*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 for unreimbursable expenses), and *Dobbins v. HHS*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 for unreimbursable expenses).  Pet. Br. at 6-8.

Petitioner emphasizes that he underwent treatment for two years and five months, which included steroid injections, physical therapy, MRI and x-ray imaging, EMG/NCV testing, prescription narcotic pain medication, and a left shoulder arthroscopy and subacromial bursectomy.  Pet. Brief at 5.  Petitioner asserts he is entitled to substantially more pain and suffering than other SIRVA cases because of the extensive treatment he received, and ultimate 50% loss of his arm function.  *Id*. at 8.  Further, petitioner asserts he is entitled to future pain and suffering because he continues to experience lack of mobility, arm function, and chronic pain.  *Id*.  As a result of his injury, petitioner avers that family and work life suffered along with his emotional health.  *Id*. at 8-9.

Respondent argues that petitioner should be awarded $117,500.00 in compensation for pain and suffering.  Res. Brief at 6.  Respondent's valuation of pain and suffering in this case is based upon "(1) the nature and degree of petitioner's injury based upon the record as a whole (i.e., whether petitioner's shoulder injury could be fairly described as being mild, moderate, or severe compared to other SIRVA cases in the Program); (2) the duration of petitioner's injury (i.e., whether it was temporary or permanent); and (3) the extent of any disability (i.e., whether petitioner's shoulder injury resulted in a partial or total disability)."  *Id*. at 9.  Respondent also stated that his approach was "informed by the court's evaluation of contested SIRVA claims, which provides a valuable context for assessing the damages in this case, and by the unique Programmatic experience gained by respondent through his resolution of hundreds of SIRVA claims within the Special Processing Unit ("SPU") over the past several years."  *Id*. at 9-10.  However, respondent does not cite any decisions relating to contested SIRVA claims.  Respondent contends that petitioner suffered a mild to moderately severe SIRVA, with permanent partial loss in the use of his left arm.  *Id*. at 10.  Respondent also notes that surgery helped alleviate petitioner's pain, and that his injury has reached its maximum medical improvement.  *Id*.  Respondent emphasizes that petitioner's post-surgical treatment records reflect that his shoulder injury is unlikely to worsen, and, "although it continues to bother him, [it] is not significantly incapacitating to petitioner.  *Id*. at 11.

### V.      Discussion

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. HHS*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  *I.D. v. HHS,* No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. HHS*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. [7] *I.D.*, 2013 WL 2448125, at *9; *McAllister* v. HHS, No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995).  Further, when an amount is awarded for "projected"—i.e., future—"pain and suffering," such amount must be adjusted to its "net present value." *Childers ex rel. Overheu v. HHS*, No. 96-194V, 1999 WL 159844, at *1 (Fed. Cir. Mar. 5, 1999) (citing *Youngblood v. HHS*, 32 F.3d 552 (Fed. Cir. 1994)).

The undersigned may look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering.  *Jane Doe 34 v. HHS*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").  And, of course, the undersigned also may rely on her own experience adjudicating similar claims.[8]  *Hodges v. HHS*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  *Graves v. HHS*, 109 Fed. Cl. 579 (2013).  Instead, it is assessed by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  *Id*. at 595.

---

[7] In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

[8] From July 2014 until September 2015 the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases, which include the majority of SIRVA claims, have remained on the undersigned's docket.

In that regard, the undersigned notes that over the past four years the SPU has amassed a significant history regarding damages in SIRVA cases.  In *Kim v. HHS*, the undersigned explained that after four years of SPU experience, 864 SIRVA cases were resolved informally as of July 1, 2018.  *Kim v. HHS*, No. 17-418V, 2018 WL 3991022, at *6 (Fed. Cl. Spec. Mstr. July 20, 2018).  The undersigned noted that the median award for cases resolved via government proffer was $100,000.00 and the median award for cases resolved via stipulation by the was $71,355.26.[9]  *Id.*  The undersigned noted that "to the extent prior informal resolutions are to be considered, the undersigned finds that the overall history of informal resolution in SPU provides a more valuable context for assessing the damages in this case.  Since it reflects a substantial history of resolutions among many different cases with many different counsel, the undersigned is persuaded that the full SPU history of settlement and proffer conveys a better sense of the overall arms-length evaluation of the monetary value of pain and suffering in a typical SIRVA case."  *Id.* at *9.

Additionally, since the inception of SPU in July 2014, there have been several reasoned decisions by the undersigned awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages.[10]  Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.

## A. Determining Petitioner's Award of Pain and Suffering in This Case

The undersigned is mindful of previous cases and those cited by the parties in their respective briefs.  However, in determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  Upon the

---

[9] The undersigned further stressed that the "typical" range of SIRVA awards – meaning the middle quartiles – is $77,500.00 to $125,000.00 for proffered cases and $50,000.00 to $95,228.00 for stipulated cases.  The total range for all informally resolved SIRVA claims – by proffer or stipulation – spans from $5,000.00 to $1,500,000.00.  2018 WL 3991022, at *6.  Importantly, these amounts represent total compensation and typically do not separately list amounts intended to compensate for lost wages or expenses.  *Id.*  The undersigned noted that "These figures represent four years' worth of *past* informal resolution of SIRVA claims and represent the bulk of prior SIRVA experience in the Vaccine Program.  However, these figures are subject to change as additional cases resolve and do not dictate the result in this or any future case.  Nor do they dictate the amount of any future proffer or settlement." *Id.*

[10] *See, e.g.*, *Desrosiers v. HHS*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017); *Dhanoa v. HHS*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018); *Marino v. HHS*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018); *Collado v. HHS*, No. 17-225, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. Jun. 6, 2018); *Knauss v. HHS*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018); *Kim v. HHS,* No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. Jul. 20, 2018); *Dobbins v. HHS*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018); *Dirksen v. HHS*, No. 16-1461, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018); *Cooper v. HHS*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Nov. 7, 2018), *Knudson v. HHS*, No. 17-1004, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018).

undersigned's review of the complete record and in consideration of the undersigned's experience evaluating SIRVA claims, the undersigned finds that an award of $185,000.00 in actual pain and suffering and $1,500.00 per year for his life expectancy (reduced to net present value) in future pain and suffering is appropriate in this case.

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving SIRVA.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute.  Thus, based on the circumstances of this case, the undersigned determines that petitioner had full awareness of her suffering.

### a.  Severity of the Injury

The undersigned finds that petitioner experienced a severe SIRVA.  Petitioner first reported left shoulder pain two days following his flu vaccination on October 22, 2015.  Ex. 2 at 11.  Thereafter, he reported significant pain at multiple treatment sessions, rating his pain at a 10 out of 10.  Ex. 2 at 163-171; Ex. 4 at 13; Ex. 5 at 87.  Petitioner reported some improvement of his symptoms with medication and physical therapy, and was pleased with his initial progress. Ex. 5 at 23-29.  However, following a brief lapse in treatment, petitioner's shoulder regressed and he again reported significant pain on February 25, 2016.  Ex. 3 at 26-27.  At that time, petitioner's physician remarked that it was the "worst case of frozen shoulder caused by flu injection" and that petitioner's shoulder was "nearly useless…." *Id.* at 27.  Petitioner ultimately underwent arthroscopic left shoulder surgery, manipulation and anterior acromioplasty, and a bursectomy on June 3, 2016. Ex. 3 at 6-9.  At the end of petitioner's post-surgical physical therapy on October 12, 2016, he reported that he was able to perform more activities as his range of motion continued to improve.  Ex. 7 at 101-102.  Petitioner also reported that his pain scale was 4 at worst, 0 at best, and at that time a 1.  *Id.*  Notably, petitioner's physical therapy goals did not include pain-free activities, but actions such as "performing household activities *with pain*" and "lifting a 10 lb. object onto an overhead shelf *with pain*."  Ex. 7 at 101 (emphasis added).

Despite petitioner's post-surgical improvements, he suffered residual pain and limited range of motion, including a permanent loss of shoulder function.  Petitioner's recent medical records describe petitioner's shoulder as "fairly functional but limited" and on August 8, 2017 Dr. Knowles noted that petitioner's range of motion was still limited "with abduction to about 90 Deg[rees], and flexion to about 110 [degrees]. [H]igher than this he has pain, no pain when arm is held at low angles."  Ex. 22 at 9.

Additionally, the undersigned has considered the extent to which petitioner's injury impacted his personal life.  For instance, petitioner has credibly described his physical difficulty in caring for his children and performing other activities of daily living.  Exs. 10, 16-21.  Petitioner's affidavits as a whole reiterate that his injury caused

physical and emotional distress, and led to significant disruptions of his ability to work, care for and interact with his family, and perform recreational activities.  Exs. 10, 16-21.

### b.  Duration of the Suffering

#### i.  Past Pain and Suffering.

As described above, the undersigned finds that there is evidence that petitioner suffered moderate to severe pain from the time of vaccination up to and until October 12, 2016, a period of approximately two years.  The undersigned acknowledges that during this time, petitioner suffered episodes of severe pain, mostly directly following the vaccination and for the period before his surgery.  Further, petitioner's ultimate outcome still involved pain with certain movements and limited mobility.  Ex. 7 at 101.  Moreover, as of March 16, 2018, petitioner was evaluated by Dr. Knowles as having lost 50% of his left arm function, and his recovery was considered stable but that it had "reached a plateau".  Ex. 22 at 5.  Based on Dr. Knowles assessment, the undersigned finds that petitioner's current levels of decreased mobility, pain and suffering, are likely to continue as further discussed below.

Thus, in light of all of the above, the undersigned finds that $180,000.00 represents an appropriate award for petitioner's actual or past pain and suffering.

#### ii.  Future Pain and Suffering

Petitioner also maintains that he continues to suffer the effects of his injury. Petitioner stresses that he continues to experience a lack of mobility, a loss of arm function, and chronic pain entitling him to future pain and suffering.  Pet. Brief at 8.  It is clear that petitioner's pain following his June 3, 2016 surgery was significantly less than the pain he experienced previously, and his range of motion was much improved. However, as of March 16, 2018, petitioner was evaluated as having lost 50% of his left arm function, and his recovery was considered stable but that it had "reached a plateau".  Ex. 22 at 5.  Therefore, petitioner's disability is considered permanent.  To cover additional pain and suffering petitioner is likely to experience, the undersigned will award some compensation for future pain and suffering.

There are only two reasoned SIRVA damages decisions that have awarded compensation for future pain and suffering: *Dhanoa v. HHS*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) and *Curri v. HHS*, No. 17-432V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018).  In *Dhanoa*, the special master awarded $10,000.00 for pain and suffering for the year immediately following the decision, but gave no award for subsequent years.  *Id*. at *7.  In *Curri,* taking into account petitioner's significant arm pain, her permanently reduced range of motion, and the unique challenges petitioner faced in her day-to-day life, the special master found that $550.00 per year to be an appropriate award for petitioner's future pain and suffering.  *Id*. at *7.

In this case, the undersigned finds that petitioner's prognosis regarding the ongoing nature of her pain and suffering is similar to that of the petitioner in the *Curri*

case. *Curri*, 2018 WL 6273562.  In *Curri*, the petitioner filed a record from her orthopedist stating that petitioner's left shoulder "had reached its 'maximum medical improvement,' leaving her with a permanent 'scheduled loss of use' of 22.5 percent of her left arm."  *Id*. at *2.   The special master awarded petitioner an award of $550.00 per year for her future pain and suffering considering petitioner's "significant arm and shoulder pain, her permanently reduced range of motion, and the unique challenges her shoulder injury creates in her day-to-day life as a working mother of three children.  *Id*. at *7.  In this case, there is a similar statement from petitioner's doctor, Dr. Knowles, regarding the permanent nature of his shoulder injury.  In Dr. Knowles most recent treatment record, he noted petitioner "lost about 50% of his L[eft] arm function" but experienced "no pain and good function when using arm below shoulder level."  Ex. 22 at 5.  Further, Dr. Knowles stated that petitioner had "reached a plateau" and that it was unlikely he would improve further.  *Id*.

Petitioner bears the burden of proof with respect to each element of compensation requested and the medical records are the most reliable evidence of petitioner's condition.  *Brewer*, 1996 WL 147722 at *22-23*; Shapiro v. HHS*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.").  Based on the statement of petitioner's medical practitioners, the undersigned finds that an award of $1,500.00 per year for his life expectancy to be an appropriate award for petitioner's future pain and suffering. This amount is to be reduced to net present value.

## VI.   Conclusion

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  In light of all of the above, and in consideration of the record as a whole, the undersigned finds that petitioner should be awarded $185,000.00 in compensation for actual pain and suffering, $1,500.00 per year for his life expectancy for future pain and suffering (reduced to net present value), and $37,921.48 for lost wages.  Petitioner was born on August 22, 1975, and his remaining life expectancy is approximately 30 years.[11]  Thus his future pain and suffering damages total approximately $45,000.00

**The parties are to file a joint status report no later than 30 days, (1) converting the undersigned's award of future pain and suffering to its net present value, and (2) reporting on all outstanding items of damages that remain unresolved, if there are any remaining issues.  Once these issues have been resolved, a damages decision will issue.**

---

[11] Petitioner's life expectancy was calculated using the tables compiled by the National Center for Health Statistics.  *See Nat'l Ctr. for Health Statistics*, *United States Life Tables, 2015* (2018) at Table A.

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Chief Special Master